## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

ARLESIA R. JOHNSON                                                          PLAINTIFF

v.                                    No. 4:10CV00700 JLH

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                              DEFENDANT

## OPINION AND ORDER

Arlesia R. Johnson brings this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act for judicial review of a final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits and supplemental security income under Title II and Title XVI of the Act, 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), respectively. For the following reasons, the decision of the Commissioner is affirmed.

## I.

On August 25, 2005, Johnson filed applications for supplemental security income and disability insurance benefits, alleging that she has been disabled since April 1, 2002. Johnson was born in 1963, so she was 42 years of age when she submitted her application for disability insurance benefits. At the hearing before the Administrative Law Judge ("ALJ"), Johnson amended her onset date to June 30, 2003. Specifically, Johnson alleges that she is disabled as a result of depression, cardiomyopathy, and hypertension.

Johnson has been seen by physicians at St. Vincent Health Clinic East since July 2005. (Tr. 294.) On November 9, 2005, Johnson was seen at the clinic for hypertension and depression. (Tr. 292.) Although she had been prescribed some medication on her first visit, Johnson reported that she was not taking the medication because she was unable to afford to fill the prescription. (Tr. 292.) She also stated she was "at the edge" and that thoughts of self-harm had crossed her mind, but she

did not have any distinct plan and had several good reasons to continue living, including her grandchild. (Tr. 292.)  At that time, Johnson said she smoked three cigarettes per day.  (Tr. 292.) She was given a prescription and voucher for Topropol XL (a beta-blocker) and samples of Caduet and Zoloft.  (Tr. 293.)

On November 22, 2005, two weeks after Johnson was treated at the clinic, Dr. S. Otho Hesterly performed a mental evaluation of Johnson's adaptive functioning.  (Tr. 105.)  Based on his interaction with Johnson, Dr. Hesterly determined that she was not limited in her speech or language; that she got along with others but did not enjoy socializing; that she could understand, carry out, and remember instructions to some degree; but that she did not seem able to respond appropriately to supervision, coworkers, and work pressure at that time. (Tr. 106.)  He diagnosed Johnson with Axis I: Dysthymia, Axis II: Avoidant Personality Disorder; Axis III: Hypertension; Axis IV: Problems with primary support group; and Axis V: Global Assessment Functioning of 48.  (Tr. 106.)

On December 13, 2005, Johnson was admitted to the emergency room at St. Vincent Hospital complaining of chest pain and dizziness.  (Tr. 150.) An x-ray was taken, and it was determined that the pain was not heart-related or serious.  (Tr. 155, 159.)  Johnson was instructed to visit the Little Rock Cardiology Clinic for a stress test.  (Tr. 155-56.)  On December 14, 2005, Johnson saw Dr. Carl Leding at the Little Rock Cardiology Clinic.  (Tr. 360.)  At that time, she said she was smoking two cigarettes per day.  (Tr. 360.)  An echocardiogram revealed cardiomyopathy with an ejection fraction of thirty to thirty-five percent.[1]  (Tr. 361.)  She was diagnosed with severe

---

[1]Listing level for chronic heart failure includes an ejection fraction of thirty percent or less measured during a period of stability.  20 C.F.R. § 404, Subpt. P, App. 1, Part A, 4.02(A)(1) (2008).

hypertension and mild congestive heart failure.  (Tr. 361.)  Dr. Leding gave Johnson prescriptions for Aldactone and Altace and instructed her to follow up with him in one week.  (Tr. 362.)

On December 21, 2005, Johnson reported to Dr. Leding for her follow-up.  (Tr. 358.)  Dr. Leding adjusted her medication by restarting her on Toprol XL and increasing her dosage of Altace. (Tr. 359.)  He expressed concern that Johnson had stopped taking the Toprol, Caduet, and Zoloft and noted that Johnson did not provide a clear reason for her noncompliance.  (Tr. 356, 359.)  One week later, on December 28, 2005, Johnson reported to Dr. Leding again, who started her on BiDil, a medication to treat heart disease.  (Tr. 357.)  At the time, Johnson denied having any chest pain.  At approximately 11:20 p.m. that evening, however, Johnson was admitted to the emergency room at St. Vincent Hospital for chest pain and headaches.  (Tr. 128.) Although the cause of her chest pain was unknown, it was determined that it was not serious or heart-related.  (Tr. 136, 141.)  She was taken off of the BiDil and instructed to follow up with her physician within one to two days.  (Tr. 137-39.)

Johnson saw Dr. Leding again on January 25, 2006.  (Tr. 193.)  He stated that her hypertension was improving with medication and opted to increase her dosage of Toprol XL and Altace.  On February 1, 2006, Johnson had a follow-up visit at the St. Vincent Health Clinic East. (Tr. 289.)  She reported that she was taking things "one day at a time" and no longer had suicidal thoughts.  (Tr. 289.)  She also said that she was feeling better since starting Zoloft and did not wish to undergo a hospital evaluation for depression because she was able "to cope for now." (Tr. 289.) Her hypertension was much improved, and her symptoms had almost completely resolved since seeing Dr. Leding on a regular basis.  (Tr. 289.)

On February 15, 2006, Johnson saw Dr. Leding for another follow-up visit. (Tr. 189.) After conducting an examination, Dr. Leding recommended that Johnson undergo a coronary angiography. (Tr. 190.) Johnson underwent the angiography on February 23, 2006. The procedure improved her ventricular function and resulted in an ejection fraction of fifty percent, which is in the normal range. (Tr. 338.) She was discharged in stable condition with a plan to continue to treat her blood pressure. (Tr. 310.)

Johnson saw Dr. Leding again on October 18, 2006, and he recommended continued treatment and another follow-up examination in four weeks. (Tr. 255.) He also recommended that Johnson talk to her primary doctor about increasing her antidepressant medication. On August 22, 2007, Dr. Leding filled out a cardiac residual functional capacity questionnaire for Johnson. (Tr. 301.) In it, he noted that Johnson's physical symptoms had caused her to have emotional difficulties and, beside the question asking to what degree Johnson could tolerate work-related stress, he wrote that he did not know. (Tr. 302.) Dr. Leding described Johnson's overall prognosis as fair. (Tr. 303.)

At the hearing before the ALJ on November 15, 2007, Johnson reported that she has a twelfth grade education and some business courses. (Tr. 376.) She has been previously employed in a number of cashier jobs, including one at Kroger and another at Sam's Barbeque. (Tr. 400-401.) She testified that she smokes one cigarette per day even though she has been advised repeatedly by her doctors to quit. (Tr. 378.) She has not been to see any mental health professionals, but she continues to see Dr. Leding every three months for her blood pressure. (Tr. 379-80.) Johnson stated that she does not always take Zoloft as prescribed because she cannot afford the medication. (Tr. 380.) Johnson reported that she believed her prescription of Zoloft had been increased from 50 to 100 milligrams per day; as of the date of the hearing, however, she had not filled the 100 milligram

prescription.  (Tr. 380.)  Although she has been on a patient assistance prescription program since

2005 or 2006, the record is unclear as to which medications the program covers and in what quantity.

(Tr. 384-85.)  Johnson lives with one of her sisters.  (Tr. 385.)  She testified that, on the day before

the hearing, she took a shower, went to the grocery store with her sister, visited a friend, made dinner

with her sister, and watched a movie.  (Tr. 385.)  She also testified that she walks around the block

twice a week for exercise.  (Tr. 382.)  Johnson said she does not mop because of the bending that it

requires, but she does sweep the floors.  (Tr. 390.)  She said she cooks occasionally, does laundry,

washes dishes, and tries to go to church.  In 2004, she quit working for a period of time to babysit

a grandchild.  (Tr. 395-96.)

At the hearing before the ALJ, a vocational expert was asked the following hypothetical:

> Let's assume we have an individual in their mid-40s, the same work history you've
> just described.  This individual has a high school education and a few business
> courses in college, but no degrees or anything.  The individual would be restricted to
> essentially light work, which is occasionally life or carry 20 pounds, frequently lift
> [or] carry ten pounds.  They could stand [or] walk about six hours of an eight-hour
> workday.  They could also sit for about six hours of an eight-hour workday.  But the
> individual also has some non-exertional limitations in that they should be able to
> perform work or interpersonal contact that's incidental to the work performed.  That
> is the complexity of the task is learned and performed by rote, with few variables,
> little judgment.  The supervision required would be simple, direct and concrete.
> Now, based on those restrictions, would this hypothetical individual be able to do
> that cashier's job . . . at Sam['s] Barbeque?

(Tr. 405-06.)  The vocational expert said yes.  The expert also expressed that the same individual

who also had a fair ability to follow work rules; a fair ability to understand, remember, and carry out

instructions; and a poor ability to relate to coworkers, interact with supervisors, and deal with work

stresses could not perform any past work.  *Id.* at 407.

Upon conducting the required five-step analysis in determining whether Johnson is eligible

for supplemental security income and disability insurance benefits, 20 C.F.R. §§ 404.1520, 416.920

(2008), *Cox v. Barnhart*, 345 F.3d 606, 608 n.1 (8th Cir. 2003), the ALJ determined that Johnson met the insured status requirements of the Social Security Act; had not engaged in substantial activity since June 30, 2003, her alleged onset date; had severe impairments—specifically, cardiomyopathy and hypertension; and did not have a listed impairment. (Tr. 15.) The ALJ specifically determined that Johnson's depression did not constitute a severe impairment. He also found that Johnson had the residual functional capacity to do unskilled, light work as defined by the regulations and was capable of performing past relevant work as a cashier. (Tr. 17,19.) Thus, on August 13, 2008, the ALJ found that Johnson was not eligible for supplemental security income or disability insurance benefits under the Act. Johnson filed a request for review, which the Appeals Council denied, and the ALJ's decision thereby became the final decision of the Social Security Commissioner. Johnson now seeks review in this Court.

## II.

This Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g) (2006). This review function is limited, namely "'to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* This Court "'may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome.'" *Id.* (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)). Nevertheless, "[t]he review [the Court] undertake[s] is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, [the

Court] also take[s] into account whatever in the record fairly detracts from the decision." *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998).

## III.

Johnson contends that the Commissioner's findings are not supported by substantial evidence. Specifically, she alleges that her depression constitutes a severe impairment and that the ALJ's hypothetical question to the vocational expert should have taken into account the full extent of her non-exertional impairments. She argues that there is no substantial evidence in the record as a whole to support the ALJ's findings that she could do past relevant work as a cashier and is not disabled.

Determining whether a claimant is disabled involves a five-step process. First, the ALJ must determine whether the claimant is involved in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b) (2008). Second, the ALJ must determine, based solely on the medical evidence, whether the claimant has a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the third step involves a determination of whether the severe impairment meets or equals a listed impairment. *Id.* §§ 404.1520(d), 416.920(d). If the claimant's impairment does not meet or equal a listing, then the ALJ must determine whether the claimant has the residual functional capacity to perform past relevant work. *Id.* §§ 404.1520(f), 416.920(f). The regulations require that even impairments that are not severe be considered in arriving at a residual functional capacity determination. *Id.* §§ 404.1545(e), 416.920(e). If the claimant cannot perform past relevant work, then the ALJ must determine whether the claimant is able to perform other work given the claimant's age, education, and work experience. *Id.* §§ 404.1520(g), 416.920(g).

There is substantial evidence in the record from which the ALJ could have determined that Johnson's depression did not constitute a severe impairment.  A "severe impairment" is one that significantly limits the plaintiff's physical or mental ability to do basic work activities.  *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992).  "Basic work activities" are the abilities and aptitudes necessary to do most jobs, which include understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921 (b). In other words, a severe impairment has "more than a minimal effect on the claimant's ability to work."  *Hudson v. Bowen*, 870 F.2d 1392, 1396 (8th Cir. 1989).

A claimant must establish an impairment by medical evidence consisting of signs, symptoms, and laboratory findings.  *See* 20 C.F.R. §§ 404.1508, 416.908.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993).  The ALJ is permitted to discount a claimant's complaints based on her failure to pursue regular medical treatment.  *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996).  "While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."  *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).  The ALJ may also consider a claimant's willingness to submit to treatment in order to determine the sincerity of her allegations. *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999).  Failure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application for benefits.  *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989).  Lack of financial resources may in some cases justify the failure to seek medical attention or follow

prescribed treatment.  *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989).  "It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention."  *Id.*; *see Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (finding no evidence to suggest claimant chose to forgo three packs of cigarettes a day to help finance medication).

There is substantial evidence in the record from which the ALJ could conclude that Johnson's depression resulted in no more than a mild limitation in the functional areas of activities of daily living, social functioning, and concentration and caused no episodes of decompensation lasting for an extended duration.  At one time, Johnson reported having suicidal thoughts, but she has stated since that she no longer thinks about it and is sleeping better.  (Tr. 289.)  Johnson indicated that she is able to care for her own personal needs and hygiene; to cook; to do household chores; and to clean around the yard.  She also takes short walks, goes grocery shopping, and watches movies.  Johnson has been prescribed Zoloft for her depression, and although she has not consistently taken her medication, she has seen improvement when taking it. (Tr. 289.)  Johnson has been urged to seek treatment from a mental health professional, but she has not done so.  She specifically stated to Dr. Leding that she did not wish to undergo a hospital evaluation because she was able to cope with her depression.  (Tr. 289.)  Although Johnson has stated that she does not like socializing, she has always been pleasant when interacting with her doctors and has not demonstrated any difficulty in communicating.  (Tr. 107, 311, 356, 360.)

Johnson contends that the ALJ erred by failing to give great weight to the opinion of Dr. Hesterly, a consulting psychologist who evaluated Johnson in November 2005, two weeks after she was prescribed Zoloft for her depression.  While Dr. Hesterly stated in his report that Johnson

could not respond to work *at that time*, he also said that she could bathe, dress, cook, clean, wash dishes, do laundry, and shop for groceries; could understand, remember, and carry out instructions to some degree; and could express ideas effectively.  (Tr. 107.)  Under "concentration, persistence, and pace," Dr. Hesterly wrote that Johnson was able to do what was asked of her.  Under the heading "social," Dr. Hesterly stated that Johnson gets along with other people, but does not enjoy being around them in a social way.  In December 2005, Dr. Jerry Henderson reviewed Johnson's medical records and found that, as a result of her depression, Johnson had mild to moderate limitations.  (Tr. 230.)  He also stated that Johnson was able to perform work where interpersonal contact is incidental to work performed, where the complexity of the tasks is learned and performed by rote, and where supervision is simple, direct, and concrete.  In light of the record, the ALJ had substantial evidence from which to conclude that Johnson's depression was not severe.

Johnson also alleges that the ALJ lacked sufficient evidence from which to determine that she had the residual functional capacity to perform past work.  This Court disagrees.  The ALJ appropriately considered all of the medical records as well as the factors stated in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), for assessing the credibility of Johnson's subjective complaints.  (Tr. 17.)  Although Johnson had an ejection fraction of thirty to thirty-five percent at one time, that improved to fifty percent following medical treatment.  Dr. Leding, her treating cardiologist, noted that Johnson could do light work.  As mentioned above, Johnson could cook for herself, bathe, dress, clean house, wash dishes, do laundry, and shop for groceries.  Although she alleged that she did not like to socialize with people, the day before her hearing, Johnson spent part of the day with her sister and went to see a friend.  Dr. Leding was satisfied enough with Johnson's progress to reduce her follow-up appointments from every week to every three months.  Johnson contends that the ALJ

discredited the finding of Dr. Leding that she could walk one to two blocks without rest or that her physical and mental symptoms would cause her to experience good days and bad days. (Pl.'s Br. at 11.)  There is no evidence that the ALJ discredited those findings, however, because neither of those findings suggest that Johnson was not able to perform past relevant work.  The ALJ found sufficient evidence in the record to determine whether Johnson was disabled, and as a result, there was no need to order a consultative examination.  *See* 20 C.F.R. §§ 404.1517, 416.917.[2]

Finally, Johnson argues that the ALJ posed a defective hypothetical, which should have set forth more severe impairments caused by her depression.  The Eighth Circuit has held that a vocational expert need only consider impairments supported by substantial evidence in the record and accepted as true by the ALJ.  *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000)).  Although the ALJ found some non-exertional impairments as a result of Johnson's depression, he did not find that she was impaired to the extent she alleges and was not required to include those unsupported impairments in the posed hypothetical.  Specifically, the ALJ did not find—and the evidence in the record does not support a finding—that Johnson had a poor ability to relate to coworkers, interact with supervisors, and deal with work stresses.  Furthermore, because the Court has found substantial evidence in the record to support the ALJ's decision that Johnson was not disabled, the five-step analysis need go no further.  *Lewis v. Barnhart*, 353 F.3d 642, 648 (8th Cir. 2003).  Vocational expert testimony is not required at the

---

[2]The ALJ also noted in his opinion that Johnson failed to adhere to a prescribed course of treatment.  Johnson alleged that she did not adhere to the treatment because she could not pay for the prescriptions, an allegation that the ALJ discredited in light of the fact that Johnson was enrolled in a patient assistance program.  At the hearing, however, Johnson seemed to indicate that not all of her prescriptions were covered by the patient assistance program.  Even without evidence of noncompliance, there is still substantial evidence in the record from which the ALJ could determine that Johnson was not disabled.

fourth step of the sequential evaluation process where the plaintiff retains the burden of proving that she cannot perform her past relevant work.  *Id.*  Therefore, Johnson's claim that the ALJ posed a defective hypothetical to the vocational expert is moot.  *Id.*

## CONCLUSION

Because the Court finds substantial evidence in the record to support the ALJ's decision that Johnson retained the residual functional capacity to return to her past relevant work, the decision of the Commissioner of the Social Security Administration is affirmed.

IT IS SO ORDERED this 15th day of June, 2011.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE